UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | |
|---|---|
| In re: | ) Chapter 7 <br> ) <br> ) <br> ) <br> ) |
| MICHAEL S. GOLDBERG, LLC <br> MICHAEL S. GOLDBERG <br>                                Debtors. | ) Case No. 09-23370 (ASD) <br> )            09-23371 (ASD) <br> ) Jointly Administered Under <br>   Case No. 09-23370 |
| JAMES BERMAN, CHAPTER 7 TRUSTEE <br> FOR THE ESTATES OF <br> MICHAEL S. GOLDBERG, LLC, and <br> MICHAEL S. GOLDBERG <br><br>           Plaintiff, <br><br>           v. <br> JASON ROSS <br> MICHAEL S. GOLDBERG AND <br> MICHAEL S. GOLDBERG, LLC | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Adv. Pro. No. 10-02122 <br> ) <br> ) <br> ) <br> ) |

**MOTION TO APPROVE SETTLEMENT AGREEMENT
REGARDING PREFERENCE AND FRAUDULENT
<u>CONVEYANCE CLAIMS AGAINST JASON ROSS</u>**

<u>BACKGROUND</u>

James Berman, Chapter 7 Trustee for the Estates of Michael S. Goldberg and Michael S. Goldberg, LLC, by his undersigned counsel, hereby moves pursuant to Fed. R. Bankr. P. 9019(a) for approval of the attached Settlement Agreement with Jason Ross ("Ross"), and in support thereof, represents the following:

1. The $11.8 million of preferential and fraudulent transfers to the defendants the Trustee seeks to recover in this action were transferred to them in furtherance of a classic and pure Ponzi Scheme (the "Goldberg Scheme")[1] which was conducted over the last 12 years by Goldberg and the Debtor, LLC.

2. The Goldberg Scheme promised (and, for a long time, paid) patently unbelievable rates of return of up to (and in some instances exceeding) twenty percent (20%) per quarter (when compounded over 100% annually), in purportedly *risk-free* investments.

3. Goldberg represented to investors that he and/or the Debtor LLC were engaged in primarily two types of business deals that generated these fantastic returns. First, in the early years of the Goldberg Scheme (but continuing throughout), Goldberg represented that he could purchase diamonds at extremely low wholesale prices on the

---

[1] A Ponzi scheme is a fraudulent pyramid-type scheme named after Charles Ponzi. Cunningham v. Brown, 265 U.S. 1 (1924). In such a scheme, money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme. See Bear Stearns Servs. Corp. v. Gredd., 397 B.R. 1, 8-10 (S.D.N.Y. 2007) (citing Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 n. 3 (2d Cir. 1995)); see, also In re: Unified Commercial Capital Inc. 260 B.R. 343 (Bankr. W.D.N.Y. 2001) ("A Ponzi scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised larger returns for their investments. Initial investors are actually paid the promised returns, which attracts additional investors."). There is a general rule - known as the "Ponzi scheme presumption" - that such a scheme demonstrates fraudulent intent as matter of law because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." Bear Stearns v. Gredd., 387 B,R. at 8-10. See also Donnell v. Kowell, 533 F.2d 462, 770 (9th Cir. 2008), cert. den. 129 S.Ct. 640 (2008); Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006); SEC v. Resource Dev. Int'l, LLC, 487 F.3d 295, 304 (5th Cir. 2007); Armstrong v. Collins, 2010 Bankr. LEXIS 28075*63 (S.D.N.Y. 2010).

ZEISLER & ZEISLER, P.C. • ATTORNEYS AT LAW
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

New York City diamond exchange and resell those diamonds for a profit sufficient to pay investors in these diamond liquidation contracts, a twenty percent (20%) rate of return every sixty (60) days (the "Diamond Deals"). The Diamond Deals also purported to grant investors a security interest in the diamonds supposedly purchased for re-sale.

4. The second and more recent set of deals involved significantly more investor funds and were based on Goldberg's representations to potential investors that he was one of a handful of "preferred vendors" of "Chase Manhattan Bank" which tellingly has been publicly known as JP Morgan Chase, N.A. ("Chase") since 2000. Goldberg represented that he had a contractual right to purchase foreclosed business assets (such as structural steel, aluminum and other construction material) from a "Chase Foreclosure Manifest" at prices low enough to allow him to re-sell those assets (usually within ninety (90) days of purchase) to large institutions at profit margins of up to one hundred percent (100%) (the "Chase Asset Deals"). Goldberg told investors that his relationship with Chase was governed by a 1999 contract between the Debtor LLC and Chase that had been updated from time-to-time (the "Chase Master Agreement").

5. Goldberg represented to investors that the Chase Asset Deals involved pre-arranged sales to major public companies such as United Technologies Corporation ("UTC"), Bechtel Corporation, Bausch and Lomb, Swinerton Builders and others.

6. Goldberg also represented to investors that the Chase Asset Deals were "risk-free" because the purported Chase Master Agreement contained a "Contract

ZEISLER & ZEISLER, P.C. • ATTORNEYS AT LAW
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

Dissolution Capital Protection Clause" which obligated Chase to repurchase the foreclosed business assets for the full amount of the purchase price if the Debtor was unable to re-sell the acquired assets to the expected ultimate buyer.

7. In stark contrast to the more complex fraudulent schemes utilized in the recent wave of high-profile Ponzi schemes such as those perpetrated by Bernard Madoff, Scott Rothstein, Mark Dreier and the Bayou Fund, the Goldberg Scheme did not involve any legitimate, or actual business or investment activity by the Debtors. All the funds used to pay investors came from other investors.

8. There was no reasonable basis for investors, including the defendants, to believe Goldberg's returns were legitimate or his representations were truthful. First and foremost, the returns, themselves, on a risk-free basis, were patently incredible. In addition, Goldberg had never been a licensed investment advisor, had no financial training and was employed, on a full-time basis, as a medical device sales representative. Moreover, the documents utilized by Goldberg in his "deals" are replete with typos, ambiguous language, erroneous information and other "red flags" that should have put even the most unsophisticated investor on notice that they were dealing with a con artist. The fact that Goldberg appeared to be able to generate a seemingly limitless number of Diamond Deals **and** Chase Asset Deals (deals that strain credulity in isolation and which taken together appear totally ludicrous) also should have alerted the defendants to the fraudulent nature of the Goldberg Scheme.

**ZEISLER & ZEISLER, P.C.** • *ATTORNEYS AT LAW*
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

9. The Debtors' Diamond Deals and Chase Asset Deals were a complete sham. The Debtors never bought diamonds or foreclosed assets with investor funds and never sold anything to the purported third-party "buyers." No "profits" or other income or proceeds were generated by any transactions involving the Debtors. All of the funds received by investors went to either pay off other investors or for Goldberg's personal use or benefit.

10. As word of these fantastic returns on virtually risk-free investments spread, increasing numbers of investors wanted "in" on the Goldberg Scheme. More significantly, the Debtors, knowingly and unknowingly, began compensating individuals and companies who brought investors to the Goldberg Scheme in return for a percentage of the investment dollars they generated ("Feeders").

11. The increased investment activity in the Goldberg Scheme (between the early 2000s and 2007) was due, in part, to the Feeders' strong incentive to bring larger and larger deals to Goldberg. The Feeders were risking other people's money while "earning" a 2% to 5% participation rate *plus*, in some instances, a finder's fee of up to ten percent (10%) on the investments made by their clients. The increased investments generated by the Feeders caused the size of the Goldberg Scheme to explode between 2007 and 2009 to involve over a hundred and thirty million dollars in transactions and resulted over a hundred investors holding the bag for tens of millions of dollars in losses.

ZEISLER & ZEISLER, P.C. • ATTORNEYS AT LAW
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

12. In mid to late 2009, more and more large investors began demanding full payment on the due dates of their contracts, instead of "rolling them over." At this point, the Goldberg Scheme became increasingly difficult to maintain. Goldberg began making later and later payments while he tried to find replacement investors to pay off those investors who were demanding money. These late payments created additional concerns among large investors who, for all the reasons stated above, feared the worst in terms of Goldberg's <u>bona</u> <u>fides</u>. Accordingly, these large investors put Goldberg under increasing pressure.

13. Shortly after the Debtor's $10 million payments to the defendants in August and September 2009, Goldberg was sued and his assets were frozen by a group of large investors whose recently invested millions had not been returned when due. At this point, Goldberg turned himself in to federal authorities.

14. On or about November 16, 2009, Goldberg admitted to federal law enforcement officials that his sole source of payment to investors was with the funds obtained from other investors. On September 13, 2010, Goldberg entered a plea of guilty to federal wire fraud charges in connection with his operation of the Goldberg Scheme pursuant to the Plea Agreement attached hereto as **Exhibit A**. In the Plea Agreement, Goldberg admitted:

> **In fact, and as the defendant well knew, each and every one of the defendant's representations were false: aside from during the first six months of his scheme, the**

6

**ZEISLER & ZEISLER, P.C.** • *ATTORNEYS AT LAW*
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

> defendant did not purchase diamonds in New York City or any other location; the defendant did not have any relationship, contractual or otherwise, with Chase; the defendant did not purchase any foreclosed and seized assets from Chase, nor did he resell any foreclosed and seized assets. **In truth and in fact, the defendant paid the promised returns to existing investors with funds he received from new investors or reinvested funds.**

(Emphasis added.)

### Jurisdiction, Venue and Nature of this Proceeding

15. On November 18, 2009 (the "Petition Date"), certain petitioning creditors filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against the Debtors.

16. On November 24, 2009, the Court entered the Order for Relief in the Debtors' cases.

17. By Orders dated January 11, 2010, the Court confirmed the election of James Berman as Chapter 7 Trustee in both cases.

18. On February 26, 2010, this Court entered an order consolidating these cases for joint administration only.

19. Ross was an investor in the Goldberg Scheme. Ross's financial transactions with the Debtors in connection with the Goldberg Scheme are set forth on Exhibit B.

ZEISLER & ZEISLER, P.C.  •  ATTORNEYS AT LAW
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

20. On July 9, 2010, the Trustee commenced an action against Ross in the United States Bankruptcy Court, District of Connecticut, Hartford Division; <u>James Berman, Chapter 7 Trustee v. Jason Ross, et al.</u>, Adv. Pro. No. 10-02122 (ASD) (the "Adversary Proceeding").

21. Ross, as an investor, directly and indirectly, received approximately $30,000.00 of phony profits from the Goldberg Scheme.

22. Based upon Ross's Sworn Representations/Disclosures which have been submitted to the Trustee, as well as an analysis of the expected expense of litigation, the Trustee and Ross have agreed, subject to Court approval, to compromise and settle the Trustee's claims against Ross as set forth in the Settlement Agreement attached hereto as Exhibit C. The essential terms of the Settlement Agreement are as follows:

23. **<u>SUMMARY OF SETTLEMENT TERMS</u>**

A. Ross will pay the sum of $40,000.00 (the "Settlement Amount") for the benefit of the Debtors' estates. Ross will not have any claim against the Estates.

B. The Settlement Amount will be paid, by bank check or wire transfer, within ten (10) days after the Order approving this motion.

C. The Trustee has examined Ross's financial statements and tax returns. The Trustee has also required Ross to execute and deliver to the Trustee the *Sworn Representations And Financial Disclosure Statement In Contemplation Of Settlement With James Berman, Trustee For The Chapter 7 Bankruptcy Estates Of Michael S.*

8

**ZEISLER & ZEISLER, P.C.** • *ATTORNEYS AT LAW*
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

*Goldberg And Michael S. Goldberg, LLC* (the "Sworn Representations/Disclosures"), a copy of which will be available for review by parties in interest.

D.  The sworn representations made by Ross includes the disclosure of all funds he has received from the Debtors, directly or indirectly for the past (ten) 10 years; all transfers of property he has made for less than full value in the past ten (10) years, and many other material financial representations. If any of Ross's representations in the Sworn Representations/Disclosures are determined to be have been materially false when made, Ross's release shall be null and void and the Trustee shall be entitled to pursue Ross for any and all claims.

E.  Nothing contained in the Settlement Agreement nor the existence of the Settlement Agreement itself, shall have any effect on any potential criminal liability of Ross.

**JURISDICTION AND VENUE**

24.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicate for the relief sought herein is Rule 9019(a) of the Federal Rules of Bankruptcy Procedure.

**STANDARDS FOR SETTLEMENTS PURSUANT TO FED. R. BANKR. P. 9019(a)**

25.  Fed. R. Bankr. P. 9019(a) provides that "on motion by the trustee and

9

**ZEISLER & ZEISLER, P.C.  •  *ATTORNEYS AT LAW***
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

after notice and a hearing, the bankruptcy court may approve a compromise or settlement."[2] The Supreme Court has recognized that "in administering a reorganization proceeding in an economical and practical matter, it will often be wise to arrange the settlement of claims in which there are substantial and reasonable doubts." In re Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25, 88 S. Ct. 1157, 1163, 20 L. Ed. 2d 1, 9-10 (1968); see also Motorola, Inc. v. Official Comm. of Unsecured Creditors, 478 F.3d 452, 462 (2d Cir. N.Y. 2007) (noting that Courts in this Circuit evaluate settlement agreements pursuant to the framework established by U.S. Supreme Court's decision in TMT Trailer Ferry). The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged. In re Penn Central Transportation Co., 596 F.2d 1002 (3d Cir. 1979).

26. Approval of a proposed settlement is within the "sound discretion" of the bankruptcy court. In re Neshaminy Office Buildings Associates, 62 B.R. 798, 803 (E.D. Pa. 1986). The court must determine whether the proposed settlement is in the "best interests of the estate." See Motorola, Inc., 478 F.3d at 465.

27. The bankruptcy court should consider five factors in striking the balance between the value of the compromise and the value of the claim: 1) the probability of

---

[2] A debtor-in-possession in a reorganization case has most of the rights of a trustee appointed under chapter 11 of the Bankruptcy Code. See 11 U.S.C. §§ 1106 and 1107.

ZEISLER & ZEISLER, P.C. • ATTORNEYS AT LAW
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

success in the litigation; 2) the likely difficulties in collection; 3) the complexity of the litigation; 4) the expense, inconvenience and delay necessarily attending it; and, 5) the paramount interest of the creditors. In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 292 (2d Cir. 1992), cert. dismissed, 506 U.S. 1088, 113 S. Ct. 1070, 122 L. Ed. 2d 497 (1993). The court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness. In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983). In addition, "because the bankruptcy judge is unequally situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." Neshaminy Office Building Assocs., 62 B.R. at 803 citing, In re Patel, 43 B.R. 500, 505 (N.D. Ill. 1984).

28.     Courts should approve a settlement when it is "'both fair and equitable and in the best interests of the estate.'" Liu v. Silverman (*In re* Liu), No. 98-5027, 1998 U.S. App. LEXIS 31698, at *1 (2d. Cir. Dec. 18, 1998) (citing 10 Lawrence P. Kind, et al., Collier on Bankruptcy ¶ 9019.02 (15th ed. 1998)). "The ultimate issue in such a matter is whether the proposed settlement falls below the lowest point in a range of reasonable settlements." *In re* Fairfield Lumber & Supply Co., 214 B.R. 441, 443 (Bankr. D. Conn. 1997) (citing Cosoff v. Rodman (*In re* W.T. Grant Co.), 699 F.2d 599, 608 (2d. Cir. 1983)).

ZEISLER & ZEISLER, P.C. • ATTORNEYS AT LAW
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

29. The Trustee respectfully submits that the proposed Settlement Agreement is in the best interests of these estates and their creditors. Unlike most other investors in the Goldberg Scheme, Ross had only one 90 day investment in the Goldberg Scheme. Although the Trustee believes that he has a very strong case against Ross, and would likely prevail against Ross on all claims asserted in this adversary proceeding, there is risk associated with any litigation and there would certainly be substantial additional costs incurred by the estates if the Trustee has to prosecute his claims against Ross. Here, the Trustee will recover all of Ross' phony profit as well as a portion of the principal from his sole transaction with the Debtors.

30. In light of the foregoing, this settlement is well within the range of reasonableness necessary to justify this Court's approval, is in the best interest of the estate and should be approved. The payment to be made to the estate is a fair compromise of the Trustee's claims against Ross taking into consideration the amount recovered relative to the amounts at stake, the likelihood of success in the litigation, the collectability of any judgment that could be obtained against Ross, and the expense, inconvenience and delay necessarily attending it.

WHEREFORE, the Trustee respectfully requests that this Court enter the Order annexed hereto approving the Settlement Agreement with Ross and grant such other and further relief as it deems just and proper.

ZEISLER & ZEISLER, P.C.  •  ATTORNEYS AT LAW
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

Dated this 7th day of March, 2011.

        JAMES BERMAN, CHAPTER 7 TRUSTEE FOR THE
        ESTATES OF MICHAEL S. GOLDBERG, LLC AND
        MICHAEL S. GOLDBERG

By: _____
        Jeffrey Hellman (ct04106)
        ZEISLER & ZEISLER, P.C..
        558 Clinton Avenue
        Bridgeport, CT 06605
        (203) 368-4234
        (203) 367-9678 fax
        jhellman@zeislaw.com

**ZEISLER & ZEISLER, P.C.** • *ATTORNEYS AT LAW*
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625