UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| | ) | |
| | ) | |
| MICHAEL S. GOLDBERG, LLC | ) | Case No. 09-23370 (ASD) |
| MICHAEL S. GOLDBERG | ) | 09-23371 (ASD) |
| Debtors. | ) | Jointly Administered Under |
| | | Case No. 09-23370 |
| JAMES BERMAN, CHAPTER 7 TRUSTEE | ) | |
| FOR THE ESTATES OF | ) | |
| MICHAEL S. GOLDBERG, LLC, and | ) | |
| MICHAEL S. GOLDBERG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Pro. No. 10-02122 |
| v. | ) | |
| JASON ROSS | ) | |
| MICHAEL S. GOLDBERG  AND | ) | |
| MICHAEL S. GOLDBERG, LLC | ) | |

**AMENDED MOTION TO APPROVE SETTLEMENT AGREEMENT
REGARDING PREFERENCE AND FRAUDULENT
CONVEYANCE CLAIMS AGAINST JASON ROSS**

**BACKGROUND**

     James Berman, Chapter 7 Trustee for the Estates of Michael S. Goldberg and

Michael S. Goldberg, LLC, by his undersigned counsel, hereby moves pursuant to Fed. R.

Bankr. P. 9019(a) for approval of the attached Settlement Agreement with Jason Ross

("Ross"), and in support thereof, represents the following:

1.      The preferential and fraudulent transfers to the defendants the Trustee seeks to recover in this action were transferred to them in furtherance of a classic and pure Ponzi Scheme (the "Goldberg Scheme") [1] which was conducted over the last 12 years by Goldberg and the Debtor, LLC.

2.      The Goldberg Scheme promised (and, for a long time, paid) patently unbelievable rates of return of up to (and in some instances exceeding) twenty percent (20%) per quarter (when compounded over 100% annually), in purportedly *risk-free* investments.

3.      Goldberg represented to investors that he and/or the Debtor LLC were engaged in primarily two types of business deals that generated these fantastic returns. First, in the early years of the Goldberg Scheme (but continuing throughout), Goldberg represented that he could purchase diamonds at extremely low wholesale prices on the

---

[1] A Ponzi scheme is a fraudulent pyramid-type scheme named after Charles Ponzi. Cunningham v. Brown, 265 U.S. 1 (1924). In such a scheme, money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme.  See Bear Stearns Servs. Corp. v. Gredd., 397 B.R. 1, 8-10 (S.D.N.Y. 2007) (citing Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 n. 3 (2d Cir. 1995)); see, also In re: Unified Commercial Capital Inc. 260 B.R. 343 (Bankr. W.D.N.Y. 2001) ("A Ponzi scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments.  Typically, investors are promised larger returns for their investments.  Initial investors are actually paid the promised returns, which attracts additional investors."). There is a general rule - known as the "Ponzi scheme presumption" - that such a scheme demonstrates fraudulent intent as matter of law because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." Bear Stearns v. Gredd., 387 B,R. at 8-10.  See also Donnell v. Kowell, 533 F.2d 462, 770 (9th Cir. 2008), cert. den. 129 S.Ct. 640 (2008); Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006); SEC v. Resource Dev. Int'l, LLC, 487 F.3d 295, 304 (5th Cir. 2007); Armstrong v. Collins, 2010 Bankr. LEXIS 28075*63 (S.D.N.Y. 2010).

ZEISLER & ZEISLER, P.C.  •  ATTORNEYS AT LAW
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

New York City diamond exchange and resell those diamonds for a profit sufficient to pay investors in these diamond liquidation contracts, a twenty percent (20%) rate of return every sixty (60) days (the "Diamond Deals"). The Diamond Deals also purported to grant investors a security interest in the diamonds supposedly purchased for re-sale.

4.    The second and more recent set of deals involved significantly more investor funds and were based on Goldberg's representations to potential investors that he was one of a handful of "preferred vendors" of "Chase Manhattan Bank" which tellingly has been publicly known as JP Morgan Chase, N.A. ("Chase") since 2000. Goldberg represented that he had a contractual right to purchase foreclosed business assets (such as structural steel, aluminum and other construction material) from a "Chase Foreclosure Manifest" at prices low enough to allow him to re-sell those assets (usually within ninety (90) days of purchase) to large institutions at profit margins of up to one hundred percent (100%) (the "Chase Asset Deals"). Goldberg told investors that his relationship with Chase was governed by a 1999 contract between the Debtor LLC and Chase that had been updated from time-to-time (the "Chase Master Agreement").

5.    Goldberg represented to investors that the Chase Asset Deals involved pre-arranged sales to major public companies such as United Technologies Corporation ("UTC"), Bechtel Corporation, Bausch and Lomb, Swinerton Builders and others.

6.    Goldberg also represented to investors that the Chase Asset Deals were "risk-free" because the purported Chase Master Agreement contained a "Contract

3

Dissolution Capital Protection Clause" which obligated Chase to repurchase the foreclosed business assets for the full amount of the purchase price if the Debtor was unable to re-sell the acquired assets to the expected ultimate buyer.

7.      In stark contrast to the more complex fraudulent schemes utilized in the recent wave of high-profile Ponzi schemes such as those perpetrated by Bernard Madoff, Scott Rothstein, Mark Dreier and the Bayou Fund, the Goldberg Scheme did not involve any legitimate, or actual business or investment activity by the Debtors. All the funds used to pay investors came from other investors.

8.      There was no reasonable basis for investors, including the defendants, to believe Goldberg's returns were legitimate or his representations were truthful. First and foremost, the returns, themselves, on a risk-free basis, were patently incredible. In addition, Goldberg had never been a licensed investment advisor, had no financial training and was employed, on a full-time basis, as a medical device sales representative. Moreover, the documents utilized by Goldberg in his "deals" are replete with typos, ambiguous language, erroneous information and other "red flags" that should have put even the most unsophisticated investor on notice that they were dealing with a con artist.

9.      The Debtors' Diamond Deals and Chase Asset Deals were a complete sham. The Debtors never bought diamonds or foreclosed assets with investor funds and never sold anything to the purported third-party "buyers." No "profits" or other income or proceeds were generated by any transactions involving the Debtors. All of the funds

**ZEISLER & ZEISLER, P.C.**  •  *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

received by investors went to either pay off other investors or for Goldberg's personal use or benefit.

10.    As word of these fantastic returns on virtually risk-free investments spread, increasing numbers of investors wanted "in" on the Goldberg Scheme. More significantly, the Debtors, knowingly and unknowingly, began compensating individuals and companies who brought investors to the Goldberg Scheme in return for a percentage of the investment dollars they generated ("Feeders").

11.    The increased investment activity in the Goldberg Scheme (between the early 2000s and 2007) was due, in part, to the Feeders' strong incentive to bring larger and larger deals to Goldberg. The Feeders were risking other people's money while "earning" a 2% to 5% participation rate *plus*, in some instances, a finder's fee of up to ten percent (10%) on the investments made by their clients. The increased investments generated by the Feeders caused the size of the Goldberg Scheme to explode between 2007 and 2009 to involve over a hundred and thirty million dollars in transactions and resulted over a hundred investors holding the bag for tens of millions of dollars in losses.

12.    In mid to late 2009, more and more large investors began demanding full payment on the due dates of their contracts, instead of "rolling them over." At this point, the Goldberg Scheme became increasingly difficult to maintain. Goldberg began making later and later payments while he tried to find replacement investors to pay off those investors who were demanding money. These late payments created additional concerns

5

ZEISLER & ZEISLER, P.C. • *ATTORNEYS AT LAW*
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

among large investors who, for all the reasons stated above, feared the worst in terms of

Goldberg's <u>bona fides</u>. Accordingly, these large investors put Goldberg under increasing

pressure.

13.    Shortly after the Debtor's $10 million payments to the defendants in

August and September 2009, Goldberg was sued and his assets were frozen by a group of

large investors whose recently invested millions had not been returned when due. At this

point, Goldberg turned himself in to federal authorities.

14.    On or about November 16, 2009, Goldberg admitted to federal law

enforcement officials that his sole source of payment to investors was with the funds

obtained from other investors. On September 13, 2010, Goldberg entered a plea of guilty

to federal wire fraud charges in connection with his operation of the Goldberg Scheme

pursuant to the Plea Agreement attached hereto as **Exhibit A**. In the Plea Agreement,

Goldberg admitted:

> **In fact, and as the defendant well knew, each and every
> one of the defendant's representations were false: aside
> from during the first six months of his scheme, the
> defendant did not purchase diamonds in New York City
> or any other location; the defendant did not have any
> relationship, contractual or otherwise, with Chase; the
> defendant did not purchase any foreclosed and seized
> assets from Chase, nor did he resell any foreclosed and
> seized assets. In truth and in fact, the defendant paid
> the promised returns to existing investors with funds he
> received from new investors or reinvested funds.**

(Emphasis added.)

6

## Jurisdiction, Venue and Nature of this Proceeding

15.    On November 18, 2009 (the "Petition Date"), certain petitioning creditors filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against the Debtors.

16.    On November 24, 2009, the Court entered the Order for Relief in the Debtors' cases.

17.    By Orders dated January 11, 2010, the Court confirmed the election of James Berman as Chapter 7 Trustee in both cases.

18.    On February 26, 2010, this Court entered an order consolidating these cases for joint administration only.

19.    Ross was an investor in the Goldberg Scheme. Ross's financial transactions with the Debtors in connection with the Goldberg Scheme are set forth on Exhibit B.

20.    On July 9, 2010, the Trustee commenced an action against Ross in the United States Bankruptcy Court, District of Connecticut, Hartford Division; James Berman, Chapter 7 Trustee v. Jason Ross, et al., Adv. Pro. No. 10-02122 (ASD) (the "Adversary Proceeding").

21.    Ross, as an investor, directly and indirectly, received approximately $30,000.00 of phony profits from the Goldberg Scheme.

ZEISLER & ZEISLER, P.C. • ATTORNEYS AT LAW
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

22.     Based upon Ross's Sworn Representations/Disclosures which have been submitted to the Trustee, as well as an analysis of the expected expense of litigation, the Trustee and Ross have agreed, subject to Court approval, to compromise and settle the Trustee's claims against Ross as set forth in the Settlement Agreement attached hereto as Exhibit C.  The essential terms of the Settlement Agreement are as follows:

23.     **SUMMARY OF SETTLEMENT TERMS**

A.     Ross will pay the sum of $40,000.00 (the "Settlement Amount") for the benefit of the Debtors' estates.   Ross will not have any claim against the Estates.

B.     The Settlement Amount will be paid, by bank check or wire transfer, within ten (10) days after the Order approving this motion.

C.     The Trustee has examined Ross's financial statements and tax returns. The Trustee has also required Ross to execute and deliver to the Trustee the *Sworn Representations And Financial Disclosure Statement In Contemplation Of Settlement With James Berman, Trustee For The Chapter 7 Bankruptcy Estates Of Michael S. Goldberg And Michael S. Goldberg, LLC* (the "Sworn Representations/Disclosures"), a copy of which will be available for review by parties in interest.

D.     The sworn representations made by Ross includes the disclosure of all funds he has received from the Debtors, directly or indirectly for the past (ten) 10 years; all transfers of property he has made for less than full value in the past ten (10) years, and many other material financial representations.   If any of Ross's representations in the

8

Sworn Representations/Disclosures are determined to be have been materially false when made, Ross's release shall be null and void and the Trustee shall be entitled to pursue Ross for any and all claims.

E.    Nothing contained in the Settlement Agreement nor the existence of the Settlement Agreement itself, shall have any effect on any potential criminal liability of Ross.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicate for the relief sought herein is Rule 9019(a) of the Federal Rules of Bankruptcy Procedure.

## STANDARDS FOR SETTLEMENTS PURSUANT TO FED. R. BANKR. P. 9019(a)

25.    Fed. R. Bankr. P. 9019(a) provides that "on motion by the trustee and after notice and a hearing, the bankruptcy court may approve a compromise or settlement."[2] The Supreme Court has recognized that "in administering a reorganization proceeding in an economical and practical matter, it will often be wise to arrange the settlement of claims in which there are substantial and reasonable doubts." In re Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.

---

[2] A debtor-in-possession in a reorganization case has most of the rights of a trustee appointed under chapter 11 of the Bankruptcy Code. See 11 U.S.C. §§ 1106 and 1107.

**ZEISLER & ZEISLER, P.C.** • *ATTORNEYS AT LAW*
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

Anderson, 390 U.S. 414, 424-25, 88 S. Ct. 1157, 1163, 20 L. Ed. 2d 1, 9-10 (1968); see

also Motorola, Inc. v. Official Comm. of Unsecured Creditors, 478 F.3d 452, 462 (2d Cir.

N.Y. 2007) (noting that Courts in this Circuit evaluate settlement agreements pursuant to

the framework established by U.S. Supreme Court's decision in TMT Trailer Ferry).  The

settlement of time-consuming and burdensome litigation, especially in the bankruptcy

context, is encouraged.  In re Penn Central Transportation Co., 596 F.2d 1002 (3d Cir.

1979).

26.     Approval of a proposed settlement is within the "sound discretion" of the

bankruptcy court.  In re Neshaminy Office Buildings Associates, 62 B.R. 798, 803 (E.D.

Pa. 1986).  The court must determine whether the proposed settlement is in the "best

interests of the estate."  See Motorola, Inc., 478 F.3d at 465.

27.     The bankruptcy court should consider five factors in striking the balance

between the value of the compromise and the value of the claim:  1) the probability of

success in the litigation; 2) the likely difficulties in collection; 3) the complexity of the

litigation; 4) the expense, inconvenience and delay necessarily attending it; and, 5) the

paramount interest of the creditors.  In re Drexel Burnham Lambert Group, Inc., 960 F.2d

285, 292 (2d Cir. 1992), cert. dismissed, 506 U.S. 1088, 113 S. Ct. 1070, 122 L. Ed. 2d

497 (1993).  The court is not to decide the numerous questions of law or fact raised by

litigation, but rather should canvas the issues to see whether the settlement falls below the

lowest point in the range of reasonableness.  In re W.T. Grant and Co., 699 F.2d 599, 608

ZEISLER & ZEISLER, P.C.  •  ATTORNEYS AT LAW
558 CLINTON AVENUE   •   P. O. BOX 3186   •   BRIDGEPORT, CONNECTICUT 06605-0186   •   (203) 368-4234   •   JURIS NO. 69625

(2d Cir. 1983), cert. denied, 464 U.S. 22 (1983). In addition, "because the bankruptcy judge is unequally situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." Neshaminy Office Building Assocs., 62 B.R. at 803 citing, In re Patel, 43 B.R. 500, 505 (N.D. Ill. 1984).

28.     Courts should approve a settlement when it is "'both fair and equitable and in the best interests of the estate.'" Liu v. Silverman (In re Liu), No. 98-5027, 1998 U.S. App. LEXIS 31698, at *1 (2d. Cir. Dec. 18, 1998) (citing 10 Lawrence P. Kind, et al., Collier on Bankruptcy ¶ 9019.02 (15th ed. 1998)). "The ultimate issue in such a matter is whether the proposed settlement falls below the lowest point in a range of reasonable settlements." In re Fairfield Lumber & Supply Co., 214 B.R. 441, 443 (Bankr. D. Conn. 1997) (citing Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d. Cir. 1983)).

29.     The Trustee respectfully submits that the proposed Settlement Agreement is in the best interests of these estates and their creditors. Unlike most other investors in the Goldberg Scheme, Ross had only one 90 day investment in the Goldberg Scheme. Although the Trustee believes that he has a very strong case against Ross, and would likely prevail against Ross on all claims asserted in this adversary proceeding, there is risk associated with any litigation and there would certainly be substantial additional costs incurred by the estates if the Trustee has to prosecute his claims against Ross. Here,

11

the Trustee will recover all of Ross' phony profit as well as a portion of the principal from his sole transaction with the Debtors.

30.    In light of the foregoing, this settlement is well within the range of reasonableness necessary to justify this Court's approval, is in the best interest of the estate and should be approved.   The payment to be made to the estate is a fair compromise of the Trustee's claims against Ross taking into consideration the amount recovered relative to the amounts at stake, the likelihood of success in the litigation, the collectability of any judgment that could be obtained against Ross, and the expense, inconvenience and delay necessarily attending it.

WHEREFORE, the Trustee respectfully requests that this Court enter the Order annexed hereto approving the Settlement Agreement with Ross and grant such other and further relief as it deems just and proper.

ZEISLER & ZEISLER, P.C.  •  ATTORNEYS AT LAW
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

Dated this 10th day of March, 2011.

JAMES BERMAN, CHAPTER 7 TRUSTEE FOR THE
ESTATES OF MICHAEL S. GOLDBERG, LLC AND
MICHAEL S. GOLDBERG

By: _____
    Jeffrey Hellman (ct04106)
    ZEISLER & ZEISLER, P.C..
    558 Clinton Avenue
    Bridgeport, CT 06605
    (203) 368-4234
    (203) 367-9678 fax
    jhellman@zeislaw.com

13

# EXHIBIT A

U.S. Department of Justice

United States Attorney
District of Connecticut

| | |
|---|---|
| Abraham A. Ribicoff Federal Building | (860) 947-1101 |
| 450 Main Street, Room 328 | |
| Hartford, Connecticut 06103 | Fax (860) 240-3291 |

September 13, 2010

Richard Brown, Esq.
Brown, Paindiris, and Scott LLP
100 Pearl Street
Hartford, CT 06103-4506

United States District Court
District of Connecticut
FILED AT    BRIDGEPORT
9/13/10

Re:    **United States v. Michael S. Goldberg**
       **Criminal No. 3:10CR192 (JCH)**

Dear Attorney Brown:

This letter confirms the plea agreement between your client, Michael S. Goldberg (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government" or "this Office") concerning the referenced criminal matter.

## THE PLEA AND OFFENSE

The defendant, Michael S. Goldberg, agrees to waive his right to be indicted and to plead guilty to each count of a three-count information charging him with Wire Fraud, in violation of Title 18 U.S.C. § 1343.

The defendant further understands that to be guilty of Wire Fraud, in violation of 18 U.S.C. § 1343, the following essential elements must be satisfied:

1. The defendant participated in a scheme or artifice to defraud or to obtain money or property by means of false and fraudulent pretenses or representations;

2. The defendant did so with the specific intent to defraud; and

3. In furtherance of the scheme to defraud, the defendant used or caused to be used interstate wires.

## THE PENALTIES

Each of the defendant's convictions for Wire Fraud, in violation of 18 U.S.C. § 1343,

carry a maximum penalty of 20 years imprisonment and a $250,000 fine. In addition, under 18 U.S.C. § 3583, the Court may impose a term of supervised release of not more than 3 years on each count, to begin at the expiration of any term of imprisonment. The defendant understands that, should he violate any condition of the supervised release, he may be required to serve a further term of imprisonment of up to 2 years with no credit for time already spent on supervised release.

The defendant also is subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense; (2) twice the gross loss resulting from the offense; (3) $250,000; or (4) the amount specified in the section defining the offense.

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction, which in this case is $300. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty pleas are accepted.

The defendant is also subject to restitution, as discussed below. Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572 (h), (i) and § 3612(g).

Finally, in addition to the standard conditions of any supervised release, the defendant does not object to the Court ordering certain additional conditions, as set forth in the attached Rider: Additional Conditions of Supervised Release.

Restitution

In addition to the other penalties provided by law, pursuant to 18 U.S.C. §3663A, the Court must order that the defendant make restitution to victims of the offenses to which he is pleading guilty. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. In addition, the defendant agrees to make restitution in an amount to be determined by the Court to all victims of his criminal conduct and not merely for those victims included in the counts to which he agrees to plead guilty.

In addition to any other restitution that may be ordered by the Court, the defendant agrees to make restitution in the amount of at least $30 million, to be determined on or before the date of sentencing. The defendant recognizes and agrees that this amount will be determined based on facts that come to the attention of the parties prior to sentencing. Payment of restitution shall be made by the defendant to the Clerk of this Court, and the parties agree that the Clerk should then be directed to remit that money to the Chapter 7 bankruptcy trustee for bankruptcy cases

-2-

number 09-23370 and 09-23371, currently pending in the United States Bankruptcy Court sitting
in Hartford, Connecticut, for the purpose of paying the creditors of the bankruptcy estate
pursuant to orders of the United States Bankruptcy Court.

    While the parties agree that restitution may be paid over the duration of any period of
supervised release imposed by the Court, the defendant is aware that, by statute, restitution is
payable immediately unless ordered by the Court.  The defendant also understands that any
restitution imposed by the Court may not be discharged in whole or in part in any present or
future bankruptcy proceeding.

    With regard specifically to the $500,000 that is currently securing the defendant's
appearance bond in the instant matter, the defendant and Government agree that upon sentencing
and release of the money by the Court, the money should be provided by the Clerk to the
aforementioned bankruptcy trustee, to be divided and paid to victims according to a stipulation to
be entered into by the trustee and the Government.

## THE SENTENCING GUIDELINES

### Applicability

    The defendant understands that the Court is required to consider any applicable
Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an
appropriate sentence in this case and is not bound by this plea agreement.  The defendant agrees
that the Sentencing Guideline determinations will be made by the Court, by a preponderance of
the evidence, based upon input from the defendant, the Government, and the United States
Probation Office.  The defendant further understands that he has no right to withdraw his guilty
plea if his sentence or the Guideline application is other than he anticipated, including if the
sentence is outside any of the ranges set forth in this agreement.

### Acceptance of Responsibility

    At this time, the Government agrees to recommend that the Court reduce by two levels
the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on
the defendant's prompt recognition and affirmative acceptance of personal responsibility for the
offense.  Moreover, the Government intends to file a motion with the Court pursuant to
§ 3E1.1(b) recommending that the Court reduce defendant's adjusted offense level by one
additional level based on the defendant's prompt notification of his intention to enter his pleas of
guilty.

    The above-listed recommendations are conditioned upon the defendant's full, complete,
and truthful disclosure to the Probation Office of information requested, of the circumstances
surrounding his commission of the offense, of his criminal history, and of his financial condition
through the submission of a complete and truthful financial statement.  In addition, the

recommendations are conditioned upon the defendant timely providing complete information to the Government concerning his involvement in the offenses to which he is pleading guilty. The defendant understands that the Court is not obligated to accept the Government's recommendations on the reductions.

The Government will not make the recommendations if the defendant engages in any acts which, in the Government's view, (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (Sentencing Guideline § 3E1.1); (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (Sentencing Guideline § 3C1.1); or (3) constitute a violation of any condition of release. Moreover, the Government will not make the recommendations if the defendant seeks to withdraw his plea of guilty or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his pleas of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations.

Stipulation

Pursuant to § 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into a stipulation, which is attached to and made a part of this plea agreement. The defendant understands that this stipulation does not set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

Guideline Stipulation

The parties agree as follows:

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

The defendant's convictions on each count of the Information are grouped according to U.S.S.G. §3D1.2(d).

The defendant's base offense level under U.S.S.G. § 2B1.1 is 7. That level is increased by 22 levels because the defendant caused or intended to cause more than $20,000,000 in loss to his victims. U.S.S.G. § 2B1.1(b)(1)(I). The level is further increased by 4 because the offense involved 50 or more victims. U.S.S.G. § 2B1.1(b)(2)(C). The level is further increased by 2 because the offense involved sophisticated means. U.S.S.G. §2B1.1(b)(9)(C). The level is further increased by 2 because the defendant was an organizer, leader, manager, or supervisor in the criminal activity to which he is pleading guilty. U.S.S.G. §3B1.1(c). 3 levels are subtracted

-4-

under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 34.

Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category I. The parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate.

A total offense level 34, assuming a Criminal History Category I, would result in a range of 151 to 188 months of imprisonment (sentencing table) and a fine range of $17,500 to 175,000. U.S.S.G. § 5E1.2(c)(3). The defendant is also subject to a supervised release term of 2 years to 3 years. U.S.S.G. § 5D1.2.

The defendant expressly understands that the Court is not bound by this agreement on the Guideline ranges specified above. The defendant further understands that he will not be permitted to withdraw his pleas of guilty if the Court imposes a sentence outside any of the ranges set forth in this agreement.

In the event the Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the Government expressly reserves the right to defend any sentencing determination, even if it differs from that stipulated by the parties, in any post-sentencing proceeding.

<u>Waiver of Right to Appeal or Collaterally Attack Conviction and Sentence</u>

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction and sentence. The defendant agrees not to appeal or collaterally attack in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241, the conviction or sentence imposed by the Court if that sentence does not exceed 188 months' imprisonment, a 3-year term of supervised release, a $175,000 fine, and $30 million in restitution, even if the Court imposes such a sentence based on an analysis different from that specified above. The Government will not appeal a sentence imposed within the stipulated sentencing range. The Government and the defendant agree not to appeal or collaterally attack the Court's imposition of a sentence of imprisonment concurrently or consecutively, in whole or in part, with any other sentence. The defendant acknowledges that he is knowingly and intelligently waiving these rights. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver.

<u>Information to the Court</u>

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this

-5-

case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

## WAIVER OF RIGHTS

### Waiver of Right to Indictment

The defendant understands that he has the right to have the facts of this case presented to a federal grand jury, consisting of between sixteen and twenty-three citizens, twelve of whom would have to find probable cause to believe that he committed the offense set forth in the information before an indictment could be returned. The defendant acknowledges that he is knowingly and intelligently waiving his right to be indicted.

### Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, and the right to compulsory process for the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives and gives up those rights and that, if the pleas of guilty are accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

### Waiver of Statute of Limitations

The defendant agrees that, should the conviction following defendant's pleas of guilty pursuant to this plea agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

-6-

### Waiver of Right To Post-Conviction DNA Testing of Physical Evidence

The defendant understands that the Government has various items of physical evidence in its possession in connection with this case that could be subjected to DNA testing. The defendant further understands that, following conviction in this case, he could file a motion with the Court to require DNA testing of physical evidence pursuant to 18 U.S.C. § 3600 and § 3600A in an attempt to prove his innocence. The defendant understands his right to have all the physical evidence in this case tested for DNA, has discussed this right with his counsel, and knowingly and voluntarily waives his right to have such DNA testing performed on the physical evidence in this case. Defendant understands that, because he is waiving this right, the physical evidence in this case will likely be destroyed or will otherwise be unavailable for DNA testing in the future.

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from his pleas of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## COLLATERAL CONSEQUENCES

The defendant further understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Bureau of Prisons or the Probation

Office will collect a DNA sample from the defendant for analysis and indexing. The defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty pleas, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of the conduct that forms the basis of the information in this case.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, defendant will not be permitted to withdraw his pleas of guilty.

## NO OTHER PROMISES

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

DAVID B. FEIN
UNITED STATES ATTORNEY


DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY

The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

MICHAEL S. GOLDBERG                                9/13/10
The Defendant                                      Date

I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

RICHARD BROWN, ESQ.                                9/13/10
Attorney for the Defendant                         Date

## STIPULATION OF OFFENSE CONDUCT

The defendant Michael S. Goldberg ("defendant") and the Government stipulate to the following offense conduct that gives rise to the defendant's agreement to plead guilty to the information:

Beginning in or about 1997 and continuing until November 2009, the defendant devised and executed a scheme to defraud numerous investors ("the investors"), by soliciting millions of dollars of funds under false pretenses, failing to invest the investors' funds as promised, paying existing investors with new investors' money, and misappropriating and converting investors' funds to the defendant's own benefit and the benefit of others without the knowledge or authorization of the investors.

Up until September 2005, the defendant transacted with investors in his own name. In or about September 2005, the defendant registered under the laws of the State of Connecticut the limited liability company Michael S. Goldberg, LLC, which at times did business as Acquisitions Unlimited Group (collectively "the LLC"). The LLC was solely owned and operated by the defendant, with its principal place of business at the defendant's home in Connecticut. Following its formation, the LLC became the defendant's primary vehicle for receiving investments made pursuant to his fraudulent scheme.

The defendant's scheme to defraud investors involved principally two different types of misrepresentations, involving alternatively investments in the purchase and resale of diamonds and distressed business assets. The defendant promised investors returns on capital of up to twenty-five percent over very short periods of time, often sixty to ninety days, with virtually no risk of loss of capital.

Primarily during the first part of the scheme, but continuing to a limited extent throughout, the defendant solicited individuals to invest money in "diamond contracts." In order to induce individuals to invest money, the defendant represented, in part and in substance, the following: (1) the defendant would use investors' money to purchase diamonds at extremely low prices from vendors in New York City; (2) the defendant would then resell those diamonds immediately at a substantial profit; and (3) the profits from the resale of the diamonds would enable the defendant to pay investors who placed money with him twenty (20), and at times twenty five (25), percent return on investment every sixty (60) to ninety (90) days.

The vast majority of the defendant's fraud involved his solicitation of individuals and organizations to invest money in the purchase of distressed assets from JP Morgan Chase Bank (formerly Chase Manhattan Bank, hereinafter "Chase"). The defendant represented to potential investors in these "Chase asset deals," in part and in substance, that: (1) Chase had granted the defendant a contractual right to purchase foreclosed and seized business assets from a Chase Foreclosure Manifest; (2) the defendant would then resell these foreclosed and seized assets, typically in prearranged transactions, to large well-known corporations; (3) the defendant's

-10-

purchase of these foreclosed assets would be at such a low price that the resale would be at a
significant profit, and would enable the defendant to pay investors a sizeable return on capital,
often up to twenty (20) percent, over a short period of time, typically one fiscal quarter (90 days);
and (4) Chase would refund the purchase price to the defendant and the LLC of any purchased
asset that could not be resold, and therefore there was no risk to the investor that any principal
investment could be lost.

        In order to induce individuals to invest in both diamond contracts and Chase asset deals,
the defendant typically drafted and entered into a "Business Investment Agreement Form" with
each investor.  In each form, the defendant set out the terms of the investment, including the asset
type (either cut diamonds or foreclosed and seized business assets), the investment period, the
amount of capital to be invested, the amount of the return on capital, and the date the return was
to be paid.   In many of the agreements, the defendant indicated that he would be responsible for
the payment of all taxes.  In many of the agreements with investors in the Chase asset deals, the
defendant stated that "the security of the principal amount is ensured by a buy-back clause with
Chase Manhattan Bank, that if the contract is canceled or is discontinued for any reason that the
principal of each investor is maintained.  All that will be lost is the opportunity cost for that
particular investment period."  In many of the agreements for investors in diamond contracts,
similarly, the defendant stated "to ensure the return of the principal amount, the cut diamonds
have been insured with Zurich Insurance Company at their appraised value (which is higher than
the purchase price).  All that could be lost is the opportunity cost."

        As part of his scheme to defraud the investors, the defendant also compensated other
individuals ("feeders") for locating new investors, primarily in Chase asset deals, through the
payment of "finder's fees."  Feeders were compensated by the defendant at rates up to ten percent
of new investments and/or between two and five percent interest per investment period.

        Based on the above representations, and other similar representations, made both by the
defendant and by feeders compensated by the defendant, the defendant induced over three
hundred fifty individuals to invest more than one hundred million dollars in diamond contracts
and Chase asset deals over approximately twelve years.

        In fact, and as the defendant well knew, each and every one of the defendant's
representations were false: aside from during the first six months of his scheme, the defendant
did not purchase diamonds in New York City or any other location; the defendant did not have
any relationship, contractual or otherwise, with Chase; the defendant did not purchase any
foreclosed and seized assets from Chase, nor did he resell any foreclosed and seized assets.  In
truth and in fact, the defendant paid the promised returns to existing investors with funds he
received from new investors or reinvested funds.

        As part of his scheme to defraud the investors, when any investor questioned the
defendant about his business relationships, either with Chase or with any other company, the

defendant often created false documents and other items to induce investors to believe that his business relationships were legitimate. These fraudulent items created by the defendant included: inventories and/or manifests, contracts, business checks, bank statements, business cards, and company identification cards. The defendant created domain names in the names of actual companies, including Chase, that would be listed on the aforementioned false documents, in case an investor attempted to verify the authenticity of the documents. In addition, the defendant opened actual bank accounts in the names of the companies to whom he purported to be selling foreclosed business assets, without the permission of those companies, that could also be used to create the false impression that the defendant had a business relationship with the companies.

*Investor Group A*

Based on the above misrepresentations made by the defendant, a group of investors located in Florida (hereinafter "Investor Group A"), by and through their counsel, collectively invested several million dollars between October 2008 and September 2009 in Chase asset deals. These investments, and subsequent reinvestments, were made pursuant to six separate Business Investment Agreement Forms between Investor Group A and the defendant. The defendant initially agreed, under the first three of the agreements with Investor Group A, that payments from the end purchaser of the foreclosed business assets would come through an escrow agent, designated by the defendant as an individual with initials M.C.

In May 2009, Investor Group A was paid directly by the defendant the principal and interest for two of the agreements, rather than through M.C., contrary to the understanding of Investor Group A. As a result, Investor Group A made several demands before continuing to invest with the defendant; among them was to meet with an official from Chase who could verify the defendant's business relationship. On or about May 11, 2009, the defendant communicated to counsel for Investor Group A ("Counsel A") that he had arranged a meeting with a Chase official for the following day. On May 12, 2009, in New York City, New York, the defendant drove Counsel A from a hotel to a Chase branch located at 510 Fifth Avenue in New York City. There, the defendant and Counsel A went to the second floor and were greeted by a woman who purported to be a Chase official with initials "J.B." J.B. provided Counsel A with a Chase business card, which listed an email address from the website chasecorpsolutions.com, and a letter on Chase stationery. J.B. confirmed for Counsel A the existence of an ongoing contractual relationship between the defendant and Chase, substantially as set forth herein. Based in large part on the May 12, 2009 meeting, Investor Group A agreed to and did in fact send nearly nine (9) million dollars in new and reinvested funds in three wires between May 13 and 15, 2009, to the LLC.

In fact, and as the defendant well knew, the woman the defendant introduced to Counsel A as J.B. was an impostor; the actual J.B. works for Chase in its Investor Relations department, did not know the defendant, and was not present for the May 12 meeting; the website chasecorpsolutions.com was set up at the direction of the defendant by an associate who had no

-12-

relationship to Chase nor authorization to create a website with the Chase name; and the Chase business card and letter on Chase stationery provided to Counsel A was fraudulent and had been created by the defendant to make Counsel A believe that the woman purporting to be J.B. was an actual Chase employee.

"Counsel B" is an attorney practicing in Connecticut who represented clients who invested with the defendant in Chase asset deals, and who invested some of his own money in Chase asset deals. Upon receipt of the first wire from Investor Group A, described in paragraph twelve (12) above, the defendant used those funds to pay Counsel B for agreements with Counsel B and his clients that were then coming due.

*Use of Interstate Wires - Counts 1-3*

In furtherance of his scheme to defraud, the defendant used the following interstate wires:

| Count | Date | Description |
|---|---|---|
| 1 | May 11, 2009 | Phone call from the defendant in Connecticut to Counsel A in Florida, in which the defendant invited Counsel A to New York City to meet with a Chase official |
| 2 | May 13, 2009 | Money wire from Investor Group A in Florida to the LLC in Connecticut in the amount of $6,725,000 |
| 3 | May 14, 2009 | Money wire from the LLC in Connecticut to Counsel B in the amount of $3,250,000, a wire which routed through Bank of America in New York, New York |

*Total Loss and Calculation of Restitution*

In total, the defendant fraudulently induced, either directly or through feeders, more than three hundred fifty individuals, groups of individuals, and organizations to invest money towards diamond contracts and/or Chase asset deals as described above. In addition, several individuals invested others' money with the defendant, with or without their knowledge.

The defendant recognizes that efforts are ongoing to ascertain the exact amount of losses caused by his criminal conduct. The defendant recognizes that the total loss to investors, for

purposes of calculating both the applicable Sentencing Guidelines range and the amount of the restitution order to be issued in this case, is at least $30 million. The defendant acknowledges that of the approximately 350 investors, between 100 and 120 lost money from the scheme, based on current information. The defendant also acknowledges that ongoing efforts by the court-appointed bankruptcy trustee for his personal estate and the estate of the LLC ("the trustee") to recover money paid to certain investors may result in an increase in the number of investors who lost money as a result of the scheme.

The defendant acknowledges that (1) actions taken by the trustee may reapportion gains and losses among the investors; (2) money paid out to any investor by the trustee to compensate for losses will reduce the defendant's obligation to that investor by the amount of the payment; and (3) money paid by any investor to the trustee, whether through settlement or adversarial action, will increase the defendant's obligation to that investor, provided that the investor has not received more from the defendant than the total of the investor's invested capital and payments to the trustee.

The defendant further acknowledges that he converted a portion of the investors' money to himself, through transfers of money both to himself and to Phoenix Entertainment, LLC, a company wholly owned and operated by the defendant. The defendant and Government acknowledge that the defendant voluntary disclosed his scheme to federal authorities in November 2009, and presented a check to the Government consisting of $500,000 of investors' money.

The written stipulation above is incorporated into the preceding plea agreement. The defendant and the Government reserve their right to present additional relevant offense conduct to the attention of the Court in connection with sentencing.

_____ 9/13/10          _____ 9/13/10
MICHAEL S. GOLDBERG                        DAVID E. NOVICK
The Defendant                             ASSISTANT UNITED STATES ATTORNEY

_____ 9/16/10
RICHARD BROWN, ESQ.
Attorney for the Defendant

-14-

## RIDER CONCERNING RESTITUTION

The Court shall order that the defendant make restitution under 18 U.S.C. § 3663A. The order of restitution may include:

1. If the offense resulted in damage to or loss or destruction of property of a victim of the offense, the order of restitution shall require the defendant to:

   A. Return the property to the owner of the property or someone designated by the owner; or

   B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

      The greater of -
      (I) the value of the property on the date of the damage, loss, or destruction; or
      (II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

2. In the case of an offense resulting in bodily injury to a victim —

   A. pay an amount equal to the costs of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care; including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

   B. pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

   C. reimburse the victim for income lost by such victim as a result of such offense;

3. In the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

4. In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant. In addition to the court-ordered restitution, the court may order that the conditions of its order of restitution be made a condition of probation or supervised release. Failure to make restitution as ordered may result in a revocation of probation, or a modification of the conditions of supervised release, or in the defendant being held in contempt under 18 U.S.C. § 3583(e). Failure to pay restitution may also result in the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. See 18 U.S.C. §§ 3614; 3613A. The Court may also order that the defendant give notice to any victim(s) of his offense under 18 U.S.C. § 3555.

-15-

Case 3:10-cv-00192-JCH Document 31    Filed 09/13/11    Page 15 of 35

Pursuant to 18 U.S.C. § 3664(j)(2), any amount paid to a victim under an order of
restitution issued by the Court shall be reduced by any amount later recovered as compensatory
damages for the same loss by the victim in (A) any Federal civil proceeding; and (B) any State
civil proceeding, to the extent provided by the law of the State.

# EXHIBIT B

Goldberg

Positive accounts per Day Schedule

| Account | Date | Description | ck# | Debit (Withdrawal) | Credit (Deposit) |
|---------|------|-------------|-----|--------------------|------------------|
| WEB_4959 | 1/25/2008 | Jason Ross | | | 75,000.00 |
| BoA_0188 | 12/10/2008 | Jason Ross | | (108,000.00) | |
| BoA_0188 | 12/11/2008 | Jason Ross | 1324 | (468.00) | 75,000.00 |
| | | **Jason Ross Total** | | (108,468.00) | |
| | | | | (33,468.00) | |

Jason V. Ross
Counter Debit 81300417001^4932

Jason Ross

6/25/2010

# EXHIBIT C

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into between JAMES BERMAN, TRUSTEE (the "Trustee) OF THE ESTATES OF MICHAEL S. GOLDBERG and MICHAEL S. GOLDBERG, LLC (collectively the "Debtors") and JASON ROSS ("Ross") as of the Effective Date shown below:

**WHEREAS**, over the last twelve years, Michael S. Goldberg ("Goldberg") and his single member limited liability company, Michael S. Goldberg, LLC ("Debtor LLC"), operated a Ponzi scheme (the "Goldberg Scheme")[1]; and

**WHEREAS**, the Goldberg Scheme promised (and for a long time, paid) unrealistic and unbelievable rates of return of up to (and in some cases, exceeding) twenty percent (20%) per quarter, in purportedly risk-free investments involving either the purchase and resale of diamonds ("Diamond Deals") and the purchase of foreclosed business assets (such as structural steel, aluminum and other construction material) from Chase Manhattan Bank at prices supposedly low enough to allow Goldberg to resell those assets (usually within ninety (90) days of purchase) to large institutions at profit margins of up to one hundred (100%) percent (the "Chase Asset Deals").

---

[1]    A Ponzi scheme is a fraudulent pyramid-type scheme named after Charles Ponzi. Cunningham v. Brown, 265 U.S. 1 (1924).In such a scheme, money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme. See Bear Stearns Servs. Corp. v. Gredd., 397 B.R. 1, 8-10 (S.D.N.Y. 2007) (citing Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 n. 3 (2d Cir. 1995)); see, also In re: Unified Commercial Capital Inc. 260 B.R. 343 (Bankr. W.D.N.Y. 2001) ("A Ponzi scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised larger returns for their investments. Initial investors are actually paid the promised returns, which attracts additional investors."). There is a general rule - known as the "Ponzi scheme presumption" - that such a scheme demonstrates fraudulent intent as matter of law because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." Bear Stearns v. Gredd., at 8-10.  See also Donnell v. Kowell, 533 F.2d 462, 770 (9th Cir. 2008), cert. den. 129 S.Ct. 640 (2008); SEC v. Resource Dev. Int'l, LLC, 487 F.3d 295, 304 (5th Cir. 2007); Armstrong v. Collins, 2010 Bankr. LEXIS  280 75*63 (S.D.N.Y. 2010).

**WHEREAS**, many (but not all) of the investors in the Diamond Liquidation Deals and the Chase Asset Deals were expecting to receive an annualized rate of return of over one hundred (100%) percent on an after-tax basis, in virtually risk-free deals;

**WHEREAS**, hundreds of investors invested funds with the Debtors based on these high rates of return on risk-free deals;

**WHEREAS**, when major investors began demanding full payment on their investments, instead of "rolling them over," the Goldberg Scheme became more and more difficult to maintain. Goldberg began making later and later payments while he tried to find replacement investors so that he could pay off those investors who were demanding their money. This created increased concern among large investors who, for understandable reasons, feared the worst in terms of the bona fides of Goldberg's transactions. This caused those investors to put Goldberg under increasing pressure and scrutiny;

**WHEREAS**, ultimately, Goldberg was sued in the fall of 2009 and his assets were frozen by a group of large investors whose contracts with Goldberg were never paid. In November, 2009, Goldberg turned himself in to federal authorities. At about the same time, those investors who had sued Goldberg and LLC for fraud joined together to commence the involuntary bankruptcy which resulted in the Trustee's appointment, in which capacity he brings this action for the benefit of all creditors of the estate;

**WHEREAS**, on November 18, 2009 (the "Petition Date"), certain petitioning creditors filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against each of the Debtors;

**WHEREAS**, on November 24, 2009, the Court entered the Order for Relief in the Debtors' cases (the "Bankruptcy Cases");

2

WHEREAS, by Orders dated January 11, 2010, the Court confirmed the election of James Berman as Chapter 7 Trustee in the Bankruptcy Cases;

WHEREAS, Ross invested $75,000.00 in the Goldberg Scheme and received $108,000.00 from the Goldberg Scheme as set forth on Exhibit A;

WHEREAS, Ross entered into a written contract with "Michael S. Goldberg representing Acquisitions Unlimited Group" using a one page Business Investment Agreement form attached hereto as Exhibit B;

WHEREAS, Ross's returns on the investment were to be 20% per quarter or an annual return of more than 100% per annum;

WHEREAS, as a result of the Goldberg Scheme, Ross received all of his original investment plus $33,000.00 in false "profit" (the "False Profits");

WHEREAS, there are no real profits in the Goldberg Scheme because the funds received from investors were never used for investment purposes and were used almost exclusively to pay off other investors as Mr. Goldberg has admitted to the Trustee and others;

WHEREAS, Ross has represented to the Trustee that he had no knowledge that the Goldberg Scheme was a Ponzi scheme until after Goldberg's arrest;

WHEREAS, Ross has represented to the Trustee that, before Goldberg's arrest, he was not aware of any facts which would indicate that the Goldberg Scheme was a Ponzi scheme other than the "too good to be true" rates of return paid by the Goldberg Scheme; and

WHEREAS, Ross has represented to the Trustee that he received no compensation from Goldberg or other investors in connection with the Goldberg Scheme, other than the amounts set forth on Exhibit A and that they have never received any payment or commission in return for persuading any other investor to invest in the Goldberg Scheme;

3

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, and based upon the accuracy and truth of the representations made by Ross to the Trustee, and with the intent to be legally bound, it is agreed between the undersigned as follows:

**1.     Payment Terms**

Ross shall return $40,000.00 which he received from the Goldberg Scheme (the "Returned Funds"). The Returned Funds shall be in the form of a bank or certified check payable to James Berman, Trustee of the Estate of Michael S. Goldberg, LLC. Payment of the Returned Funds shall be made within fourteen days of the Court's approval of this Settlement Agreement.

**2.     Payment Basis**

The payment of the Returned Funds represents a payment of all of Ross's False Profits plus a disbursement to the Estate of a portion of Ross's original investment in the Goldberg Scheme.

**3.     Ross's Representations**

This Settlement is being entered into based upon Ross's express representations that: (1) he was never actually aware (despite any suspicions he may have had) that the Goldberg Scheme was a Ponzi scheme prior to the Petition Date; (2) he never received any payment or commission in return for persuading any other investor to invest in the Goldberg Scheme; (3) he received no compensation, directly or indirectly, from the Goldberg Scheme, except as set forth on Exhibit A; and (4) that he had no knowledge concerning any fact which would have placed him on inquiry notice that the Goldberg Scheme was a Ponzi scheme, other than the outlandish rates of return paid under the Goldberg Scheme. Ross further represents that no entity owned or controlled by him and no family member or Ross insider as defined in 11 U.S.C. § 101(31) has

received any payment or benefit, directly or indirectly, from the Goldberg Scheme except as set forth on Exhibit A. If, at any time, these representations are determined by the Court, after notice and a hearing, to be materially false, the release set forth in Paragraph 4 shall be null and void.

Ross has delivered to the Trustee fully completed and executed *Sworn Representations And Financial Disclosure Statement In Contemplation Of Settlement With James Berman, Trustee For The Chapter 7 Bankruptcy Estates Of Michael S. Goldberg And Michael S. Goldberg, LLC* (the "Sworn Representations/Disclosures"), which have been bates-stamped. The Trustee will review the Sworn Representations/Disclosures prior to the first date set for a hearing (the "Initial Hearing Date") on the Ross Rule 9019 Motion and shall approve or reject them on or before that date. The Trustee shall communicate his approval/rejection of the Sworn Representations/Disclosures immediately to Ross. In the event the Trustee rejects the Sworn Representations/Disclosures, the Trustee shall not be bound by this Stipulation/Order and shall not be obligated to prosecute the Ross Rule 9019 Motion.

## 4.    Trustee's Release of Ross

In consideration of the payment of the Returned Funds, the Trustee, hereby expressly releases any and all claims that he may have against Ross, and his heirs, devisees and assigns ("Releasees") relating to his investment in the Goldberg Scheme, including any and all actions, causes of action, rights, claims, costs, liabilities, damages, losses, expenses, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, expenses, executions, compensation, or demands whatsoever against said Releasees, the Trustee ever had, now has or which he shall or may have in connection with the transactions set forth on Exhibit A.

5. **Waiver of Claim**

Ross hereby waives any right that he may have to assert a claim of any sort against the Trustee, the Debtors or their Estates.

6. **Court Approval**

The parties agree that this Settlement Agreement and the release herein, being full and final, except for a breach of Ross's representations, is subject to approval of the United States Bankruptcy Court and the Trustee shall promptly submit this Settlement Agreement for such approval pursuant to a Motion to Compromise the Trustee's claims against Ross under Rule 9019 of the Federal Rules of Bankruptcy Procedure. In the event the Court does not approve this Settlement Agreement, this Agreement and all provisions herein shall be null and void.

7. **Other Provisions**

A. **Governing Law**. The validity, effect and construction of this Settlement Agreement and any obligations undertaken pursuant hereto, and any dispute relating or arising from the negotiation and execution of this Settlement Agreement, shall be governed by the laws of the State of Connecticut, without regard to the conflicts of laws provisions. The Trustee and Ross consent to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Connecticut to adjudicate any dispute arising under or related to this Agreement.

B. **Breach**. The parties understand, acknowledge and agree that this Settlement Agreement may be used as evidence in any subsequent action or proceeding in which either party alleges a breach of this Settlement Agreement or asserts any claims inconsistent with its terms. In the event a party breaches this Settlement Agreement, the party successful in enforcing

this Settlement Agreement shall be entitled to all costs of collection including, but not limited to, reasonable attorney's fees.

C.   **Attorney's Fees, Costs and Expenses**.   The parties shall each bear all of their own attorney's fees, costs and expenses incurred in the negotiation and execution of this Agreement.

D.   **Consultation with Counsel**.   Ross acknowledges that he has consulted with Attorney Harold Rosnick in connection with this Settlement Agreement.   Ross hereby acknowledges that he has not received or relied upon any advice, legal or otherwise, of the Trustee or his counsel in entering into this Settlement Agreement.

E.   **Counterparts**.   This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original.

F.   **Titles**.   The titles of the paragraphs of this Settlement Agreement are inserted for convenience only and shall not affect the meaning or construction of any of the terms of this Agreement.

G.   **Entire Settlement Agreement and Amendment**.   The parties understand, acknowledge and agree that this Settlement Agreement contains and constitutes the entire Agreement and understanding among the parties, that no other representation, promise or covenant of any kind has been made to induce or cause any of the parties to execute the Settlement Agreement, and that all the understandings and agreements of the parties are embodied and expressed herein. The parties also agree that this Settlement Agreement may not be amended, except in a writing signed by each and every one of the parties to this Settlement Agreement.

**H.    Effective Date**.    This Settlement Agreement shall not be effective until the "Effective Date", which shall be the date on which this Settlement Agreement is approved by the Court pursuant to a final order.  This Settlement Agreement and the compromise reflected herein, once effective, shall remain effective, enforceable and binding on all parties notwithstanding the dismissal or conversion of the Bankruptcy Case to another Chapter of Title 11.

**I.    Waiver**.  The failure of any party to insist upon strict adherence to any term of this Settlement Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term of any other term of this Agreement.

**J.    No Admission**.  This Settlement Agreement is not an admission of liability by any of the parties and shall not be construed as such in any subsequent proceeding.

**8.    Assignment of Claims**

As further consideration for this Agreement with the Trustee, Ross hereby irrevocably assigns to the Trustee any and all Claims as such term is defined in Section 1015 of the Bankruptcy Code of any kind whatsoever that he may have concerning or in connection with the Goldberg Scheme against any parties other than the parties to this Agreement, including but not limited for all causes of action against third parties for any loss, expense or damage suffered by Ross in connection with the Goldberg Scheme.  Ross agrees that, if necessary, he will cooperate in the proceeding of such claims, including executing a separate assignment as and when necessary.  This assignment is conditioned only upon the approval of this Agreement by the Bankruptcy Court.

8

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound, have duly executed this Settlement Agreement in multiple originals as of the last date shown below.

DATE: _____, 2011     JAMES BERMAN, TRUSTEE OF THE ESTATES
OF MICHAEL S. GOLDBERG AND
MICHAEL S. GOLDBERG, LLC

_____

DATE: _1 – 7_____, 2011

_____
Jason Ross

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| | ) | |
| | ) | |
| MICHAEL S. GOLDBERG, LLC | ) | Case No. 09-23370 (ASD) |
| MICHAEL S. GOLDBERG | ) | 09-23371 (ASD) |
| Debtors. | ) | Jointly Administered Under |
| | ) | Case No. 09-23370 |
| JAMES BERMAN, CHAPTER 7 TRUSTEE | ) | |
| FOR THE ESTATES OF | ) | |
| MICHAEL S. GOLDBERG, LLC, and | ) | |
| MICHAEL S. GOLDBERG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Pro. No. 10-02122 |
| v. | ) | |
| JASON ROSS | ) | |
| MICHAEL S. GOLDBERG  AND | ) | |
| MICHAEL S. GOLDBERG, LLC | ) | |

## ORDER ON AMENDED MOTION TO APPROVE SETTLEMENT AGREEMENT AND ORDER REGARDING PREFERENCE CLAIMS AGAINST JASON ROSS

The Chapter 7 Trustee's Amended Motion to Approve Settlement Agreement Regarding Preference Claims Against Jason Ross (the "Motion") having come before the Court, the Court having reviewed the Motion, and there being due and sufficient notice and cause to grant the relief sought therein, it is therefore:

ORDERED that the Amended Motion be, and it hereby is GRANTED; and it is further

ORDERED that the Settlement Agreement executed by the Chapter 7 Trustee and Jason Ross and attached to the Motion is hereby approved and binding upon all parties thereto.

BY THE COURT


_____
ALBERT S. DABROWSKI
UNITED STATES BANKRUPTCY JUDGE

2